The next matter, number 24-1431, Jesse Sutherland v. Peterson's Oil Services, Incorporated. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, Attorney Lucas Stenville on behalf of the plaintiff, Appellant Jesse Sutherland. And if, may I ask to reserve two minutes of rebuttal time? You may. Thank you. This is an employment claim, and like many, it's messy. But one thing is clear. The reason given for terminating my client in the midst of COVID, when they were facing a shortage of oil service technicians, many were out on protected leave, and they terminated him supposedly because he couldn't do, or he didn't, he had agreed not to do installations, but he actually did them. But half of the technicians didn't do the installations. The reasoning given makes no sense, right? But before I get into the pretextual basis for the termination, I want to jump into what has been deemed by the Massachusetts Appeals Court. And this court has, like experience with it, an amorphous law, which is wrongful termination in violation of public policy. How does one define public policy, right? And I think that the analysis in Murray v. Warren Pumps is really spot on and helpful in this case. Now, in Murray v. Warren Pumps, Mr. Murray was a safety inspector at Warren Pumps. They made pumps for various machinery, including submarines, including for the government, right? And he had made some complaints about whether or not some bolts were being checked, and whether or not the people on the floor were engaging in the process of making this safely, so the safety of the employees, right? And this court in Murray v. Warren Pumps held that that was not like Falcon v. Ledger, right, where I think this case is right on with Falcon v. Ledger. Are you arguing the wrongful discharge claim? Yes, Your Honor. Okay. Yes, Your Honor. And this court found that the plaintiff there, the essence of finding a wrongful discharge in violation of public policy is that someone is objecting to some direct harm, right? And in Falcon v. Ledger, we had that direct harm, right? We had a manufacturer of electrical wires, and that manufacturer was attempting to send its customers faulty wiring, stamped with a guarantee of reliability from an independent auditor, and it tripped. So are you arguing that there was a law, that there was a public policy, or that there was some regulation? Your Honor, I'm not. Yes, I'm arguing that there is a public policy to protect the safety and welfare of the citizens of the Commonwealth of Massachusetts. So that would then mean any conduct that threatened people's safety or welfare would qualify for a wrongful discharge? No, Your Honor. Only when the opposition is to a direct harm, right? And this is kind of a causation kind of analysis, like they did in Oliveto, and like was done in Murray v. Warren Pumps. It can't work in an environment like, say, a hospital in the Shriners case, and have a nurse complain about communications between doctors and nurses, and because that might impact patient care, call that, you know, in safety or public policy. It has to be a direct harm. My client had been an oil service technician since 1989 when he got out of high school. When he was hired in 2019, he knew immediately the harm that the defendant's oil or biofuel content in their oil was causing. And it's in the record that the Commonwealth settled with this company because of that harm, because it was providing the Commonwealth with oil that had a biocontent, which is like a plant fuel content. Counsel, I thought that the settlement wasn't so much about whether it was harmful, but whether it was deceptive practices that the employer had engaged in. And I think the question I have for you, I understand your client has very strong views that the biofuel is not safe, but the cases seem to require something more than just the individual's own view for it to be a public policy. And so here, is there really anything more than just your client's belief that the biofuel is dangerous? Well, my client is one of the key witnesses in the class action against the defendant brought by the customers whose heating systems have broken as a result of the biofuel. So it's not just an opinion. He's been working in the field for 30 years, and he's opining in that case as to why they destroyed these people's home heating fuels. So it's not just a lay opinion. He's an expert on the matter. No, I understand that, but it's still – what I'm trying to get at is for something to qualify as public policy, it usually has to be more than sort of an individual's view, even if they're an expert. And I'm just not sure that that's met here, so I'm wondering if you can address that. There is not a regulation limiting the quantity of biofuel in home heating systems, right? There's a standard of practice, and the record reflects that the defendants violate that standard of practice. And there are – violating the warranties of all of these oil burners that say you cannot put more than 15 percent of biofuel into them, or you risk what has happened to this defendant's customers, right, and the mass class action that they're currently facing in Superior Court, right? So I don't think – so maybe Mitsishin is helpful, right? Mitsishin was the woman who worked for the piano company, and they were selling pianos that were of poor quality, but selling them as if they were awesome, right? And the court there, the Massachusetts Appeals Court there, stated, look, deceptive conduct can constitute – opposing deceptive business conduct under 93A, right, can constitute protected activity for the purposes of wrongful termination, right? And it – but it has to – it has to promote – it has to go to present a threat to public health and safety. That's the language of MassApp court, right? And it's not that – so there's your law, right? And in Mitsishin, the court noted, under 93A, unfair acts and practices can range from the annoying to the disastrous. Here, we have the disastrous. And it's not just an opinion. It's in – it's a class action now, right, based on all of that harm. Thank you, counsel. Thank you, Your Honor. At this time, would counsel for the amicus please introduce himself on the record to begin? Good morning, Your Honor. This may please the court. I'm Jeremy Horowitz with amicus EEOC. I'd like to start by explaining how Mancini addresses a number of the coverage issues with respect to the ADA in this case. First, the district court found that the plaintiff could not establish that he was disabled within the meaning of the ADA because he had only relied on his own complaints and a doctor's note. But as this court made clear in Mancini, there are some kinds of impairments where more is not required. And a knee injury is one of those where a lay jury could see – could hear about a knee injury and could understand that that was impairing. Moving to the issue of substantial limitation, similarly, a – well, the ADAAA expanded the definition of what substantially limiting is under the ADA. And as this court explained to Mancini, a lay jury could understand that a knee injury of the type that Mr. Sutherland had here was substantially limiting in terms of his daily activities of walking, standing, bending, that sort of thing. Again, no further medical evidence was required when a lay jury would be able to understand this sort of impact that it would have. As the ADAAA makes clear, its point was to expand this definition of what is substantially limiting because courts interpreting it had applied too narrow an understanding. So that's what the ADAAA does. That's what – and that expands the definition to include a knee injury along the lines that Mr. Sutherland had here. Counsel, and one of the key issues, I believe, is that there was enough information, according to your view, to make it clear that there was a substantial limitation. In other words, it wasn't conclusory. There wasn't just an allegation. I've been impacted in daily activities. There were actually details about the impact. That's exactly right, Your Honor. As this court said in Mancini, a plaintiff's testimony can often be enough for this purpose. And here, the description in his deposition, it's at page 519 and 520 of the appendix, really goes into expansive detail about the effect. There are also other places in the record that we've cited his affidavit and his contemporaneous text messages to the dispatcher that all really cover that issue. But it would have been necessary for it to be specific enough at the time to the employer, correct? I understand what he said at the deposition, but for the employer to understand that there's a substantial limitation, he needed to make it clear. Right. At the time, so really we'd be looking at the text messages. That's correct. Well, the text messages, yes, that's correct, Your Honor. But with the request for an accommodation, he said he was looking for a little bit of mercy because the pain was excruciating and he wasn't able to perform the job under his ways. So a reasonable jury could certainly find that that covered that base. Moving on to whether he was following surgery and following his recovery period, whether he still qualified as disabled under the other prongs of the statute, the regarded as and the record of, the district court found that he couldn't be covered under the regarded as provision because it felt that there was more needed showing the substantial limitation. But again, Mancini instructs us that under the 80 AAA, that's no longer part of the requirement for a regarded as claim. And the Morgan case that we filed at 28J later on really does go into some nice detail on this particular point. Turning to the essential functions, a reasonable jury could find that the plaintiff could perform the essential functions of his job with a reasonable accommodation. The district court found that per se, the accommodation sought were not reasonable. But as this court has instructed on numerous occasions, applying per se rules is inappropriate and this would be a case by case determination. And here, with respect to the not performing installations and not working on call shifts, because the defendant agreed before hiring the settlement that he didn't have performance functions, a reasonable jury could certainly find that they weren't an essential part of the job. In terms of what he needed to, well, sorry, I see my time is almost up. So I do want to mention that the retaliation claim was not necessarily coterminous with the failure to accommodate claim. So the court erred in that way as well. Thank you. Thank you, counsel. Thank you for your time, Your Honor. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? May it please the court, Brian Dugan on behalf of the appellee, Peterson's Foil Service, Inc. First, I'm going to address the disability and accommodation allocation by the plaintiff. The plaintiff, he would occasionally talk about his need in text messages to the dispatcher. And when he finally asked for some less hours, the employer asked him, they said, go to the doctor, bring us a note so we can find out what's going on and what you need. So he does do that. On December 18th of 2019, he brings in a note from the day before after he saw his doctor. And the note merely says, quote, due to knee pain and swelling, it's my recommendation that he work six hour days, five days a week. That's the only medical note that they ever received. The only other complaints of knee pain they had were periodic text messages where sometimes during the day his knee would swell and he wouldn't be able to, he would ask that he go on no more calls. He said, I'm done for the day. But that was periodic. He would go home, he would rest the knee, ice or do whatever he does, and then he would come back the very next day and he'd be back to work just like normal. That's hardly enough evidence to show that you have a disability. Now, let's look at that period of time from when he brought in that doctor's note until he goes out. It's about five to six weeks, December 18th to January 26th. During that period of time, let's look at what happened. So he brings in a note saying I need to shorten my days to six hour days. But what happens after that period of time is his days and his job is lessened. His days are shortened, his job is lessened. Before that December 18th note, he is doing about 3.6 jobs per day. Those are the ones that he's accepting. After that period of time, it went down to 2.8. So there's objective evidence that he was working less. Then you get into the text messages, and they're very revealing in this case. I mean, there's hundreds of pages of them. But first time he sends a text message in after he brings in that doctor's note is December 20th. First assignment in the morning, he's given his assignment at 7 a.m. by dispatch, and the plaintiff says, well, I'll do it, but do you have anything that's a little bit easier on my knee? And dispatch says, yes, we'll send that job to somebody else. Here's an easier job. Here's a service call. December 23rd, he says, I've finished the job. My knee's had it for today. I'm done. And he's done for the day. These aren't the end of the days. This was at 1 p.m. December 27th, again, around 1 p.m., he says, can you do another call? He says, no, knee is swollen. Dispatcher, okay. December 30th, he says, he needs assistance with the job. Dispatcher says, assistance is on its way. On that same day, around 11 a.m., 12 p.m., he says, my knee's done, so I'm done. Dispatcher says, okay. January 10th, he says, knee is effed. Dispatcher says, do you need help? He says, no, I don't need help. I'm that good. And he says, don't tell anyone that I'm that good. Meaning, I can do this job with how my knee is, but don't tell anyone that I can do it like that. So December 20th, he says, I can't do it. Install a dispatcher. Says, oh, I'm sorry, I forgot. Disregard that. I'll give it to somebody else. His employer honored every request that he made. Every time he said, I'm done for the day, they said, okay. Every time he said, I can't do that, they said, okay. I don't know what more an employer can do for an employee. But the one request that he did make, and the request that he made was that he only worked six-hour days. They couldn't guarantee that it was going to be a six-hour day because of the nature of the business. Somebody calls with no heat. You say, yeah, I can have somebody there at 3 o'clock. He goes there at 3 o'clock. Uh-oh, the job needs to go to 5, and he says at 4, I have to leave. Well, now the person doesn't have heat.  Yes. Counsel, I think it seems like you're focusing on making an argument that he was accommodated, even though my understanding from the record is that the employer never actually responded to his request for the accommodation. So he never had a real discussion with his manager or the owner. That's correct, right? But you're saying, in effect, they accommodated him. That's your argument? Yeah, I'm saying, well, number one, they more than accommodated him. And what I was just about to say is that the exact accommodation that he requested, the six hours, they couldn't guarantee a set amount of hours. But what if we focus on the other claims other than just the accommodation, which is his ultimate termination? Can you move to those claims?  Yeah, the termination came about after he had already had surgery. He had physical therapy. He was cleared full duty to go back to work by his surgeon. And he sent the text messages to the vice president saying, hey, I'm okay to return. And what happened when he went out in January of 2020, what happened when he tried to come back in April was coronavirus, COVID hit. And it changed everything. And it changed pretty much everything for a lot of people, but especially for the heating oil business. What happened was they saw a 65 percent decrease in work. So they didn't need all the employees. Now, this goes back to what the plaintiff did for the employer. He didn't want to do installations. He very rarely did them. He asked not to do them. He didn't do on-call service. On-call became a big thing during coronavirus because the customers were foregoing their regular service. They didn't want anybody in their house. Counsel, I think the issue, though, is whether there was enough here to go to a jury to show that the reason you're talking about, the reason that was provided by the employer. But, of course, the plaintiff introduced evidence that that reason wasn't the real reason. And, in fact, many of the technicians were out on leave under a program that still paid them, and he wasn't offered that opportunity. So I think it would be really helpful if you could focus on why wasn't there enough here to dispute your client's position. Well, one of the things that the plaintiff relied on was an affidavit of an employee. And that employee, his name escapes you, but he submitted an affidavit stating that there's plenty of work. And his last day working there was April 4th. So that was one of the big pieces of evidence that showed that there was enough work available. But they had a 65% decrease in work. There's been no evidence that they didn't have that significant drop. They submitted evidence that the regular service, which is what he did, there simply wasn't as much regular service as there once was. And what he did was he did the on-service call. So when it was time to come back, the reason why they didn't get right back to him right away, there was a variety of reasons. One, because they didn't really have anything for him to do. And when they realized that, well, we can't have him come back because there's nothing to do, they were taking a lot of their employees that they already had, and they were basically making up work for them in-house. They were putting scrap metal into old boilers that they had backlogged and things like that. So they were making up work for the technicians that were there. And they had a technician in the plaintiff that didn't want to do installations. Then he doesn't take calls. And then one of the messages that he sent to the vice president indicated, well, I have my daughter living with me, so I'm hesitant to interact with clients because I don't want to bring home anything to her. So then he really couldn't do service. So what could he do? There was really nothing for him to do. They didn't have enough work for him to do, so they made a decision. Somebody had to be let go. And because there was nothing for him to do, it was him that was let go. Any questions? Judge Selle, any questions? No, none. Thank you, counsel. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a two-minute rebuttal. Yes, Your Honor. Lucas Neagle for the plaintiff appellant. They never discussed with him what he could do. He was out for surgery, scheduled to come back on April 20th, texted the boss on April 8th, never heard back. The employee, the fellow employee, was there until April 4th, so right around the time that his boss ghosted him and stated that because there were so many people out of work, that's in the record that from a half to a third of the employees were out on paid protective leave. So this other service technician's affidavit said because there were so many people out on work, on leave, that they couldn't do the work that they had. And I feel like we're trying the case here, but if you go to pages 224 to 229, there was not a 65% reduce in work. And, in fact, there was a decrease in installations, and they said they fired him because he wouldn't do installations, which he did actually do installations, unlike half of the other service technicians. It makes no sense. They said that they fired him because he wouldn't do on-call work. That's night work. What? Because people didn't want people to come in their house during the day, but now because of COVID, they want them to come in during the night. Like the logic behind firing someone because at the beginning he said he wouldn't do installs, even though he then did installs, and keeping on all of the other service technicians, half of which did not do installs. You can't say you fired someone for not doing installs when half of your people don't do installs. That makes no sense. A juror would get that. A reasonable juror would get that. That's why this case is for a jury, Your Honors. Thank you, counsel. Thank you. Thank you, counsel. That concludes argument in this case.